United States v. Peralta May it please the Court, Jason Carr appearing on behalf of James Peralta. Peralta suffered a deprivation of rights of constitutional magnitude, of the most extreme form. You know, when Mr. Peralta appeared at his arraignment and plea in front of a federal magistrate on this very charge, he was advised, as is the custom and practice in the District of Nevada, that he had certain rights. Among those rights were the rights to present witnesses, the right to testify on his own behalf, the right to a jury trial. Mr. Peralta did not receive those rights in this manner. And it's important to recognize that the criminal justice system is not just outcome determinative. The appearance of justice, the appearance of due process and fair play is important before society condemns an individual to prison, before we put that moral condemnation on a defendant. In this case, there's no way Mr. Peralta or his family could have felt this conviction was fair. He was denied the right to get on the stand and tell his story. And his story was not facially implausible. His story was not factually impossible. His story – he had a story that if the jury believed him would have entitled him to at the very least an instruction on justification and perhaps even an acquittal. Mr. Carr, are you arguing for the rule that a defendant should be allowed to put on any defense no matter what evidence he has to support it? What does that do for the rules that basically permit the trial court to exclude from the evidence arguments on either side that simply waste time, confuse the jury or otherwise obfuscate the issue? Your Honor, there's no doubt that the case law in this circuit is articulated in cases like Marino and Durell-Woodford is that if the defendant's story is factually impossible, facially implausible, that he does not have the right to present that evidence to a jury. The trial court does have a gatekeeping function here. But as was – as this Court has stated before, though, that gatekeeping function is extremely limited. But the Court – the Court is not allowed to make credibility determinations. The Court is not allowed to evaluate the strength of the proffer. The Court can only say this is a factually impossible scenario the client is running, or if I believe his factual proffer, that it doesn't support the elements of the defense as a matter of law. There's no doubt that the Court has that gatekeeping function. But in this case, our argument is his proffer did indeed meet the elements. They could have – the district court could have believed that they were weak and substantial, tenuous, not to be believed. That doesn't matter. That's not the trial court's problem. As the Supreme Court has said many times in cases like Sandstrom v. Montana, the defendant has a real constitutional right to have the jury determine contested issues of fact. But under our four-part test, doesn't the trial court essentially have to satisfy itself that there is, for want of a better term, a prima facie showing of evidence to establish each of the four elements, similar to a showing that a party must make in a summary judgment motion in a civil case before we'll allow the case to go to the jury for resolution? I agree with that, what you just said. The Court must make – see if there's a triable issue of fact on each of the four elements. You know, if the facts – if a defendant came to court and said, my defense is going to be that little green man came from Mars and stuck the gun in my pocket, well, that's factually impossible. It's not plausible. It's not a triable issue. The Court certainly could say, no, Mr. Defendant, you're not allowed to present that. Well, isn't that what the trial judge did when Judge Hunt said, for example, with respect to the third element, I find that Mr. Peralta failed to pursue reasonable legal alternatives. He could have left the scene or he could have called 911 to summon the police in order to quell the situation with his brother. And isn't that what the trial court did in this case? Your Honor, it's different in kind. Because with Peralta, he didn't submit to the trial court a factually implausible, ridiculous story. I mean, what the Court just talked about, those are classic issues that the jury should have been able to determine. Because his proffer was, I never had – this is a rapidly unfolding exigent situation that his brother was reaching for this gun in the toolbox. He stopped it. And we have great facts here about the – I understand that. The part of this that – well, just explain the facts as you understand them. He stopped his brother. And then what did he do? Well, he – the proffer, which is assumed to be true, is that he was – his brother, who has previously been institutionalized as violent, psychotic tendencies, was in an argument with him, punched Mr. Peralta, started threatening him with physical  He looked into the tool – his brother started looking in the toolbox and reaching toward it. And James saw what he was going for, saw there was a gun in there – and incidentally, his dad would have testified, I keep a loaded gun in the toolbox – that he grabbed the gun and tried to call – to keep it away from Richard and tried to calm him down. Talked to him, defused the situation, and eventually got Richard to go inside the residence. But then doesn't the evidence also show that he put the gun in his waistband and then went out and worked on his motorcycle? He did, Your Honor, but – So when the – so then when the people came, the probation officers, whoever it was – The officers. He was working on the motorcycle with the gun in his belt. Right. And I would concede that that fact right there is the weakest fact we have in this case. Right. But it's just exactly – it's sort of analogous to what happened in Newcomb. First of all, the proffer that was given is that the cops came within minutes after this altercation. Within four minutes is what the proffer says. What James Peralta, through his proffer, said is that, I did not feel like I had a safe place to stash the firearm. That I believe my brother, even though he momentarily retreated into the house, still posed a continuing threat not only to myself, but to himself and to these neighborhood children who he may have just sworn at, you know, a few minutes beforehand. Would it have made a difference if the evidence had shown that he'd unloaded the weapon? Well, Your Honor, that would – that's something that a jury could say, well, that would have been a reasonable thing for him to do. And that the jury could have said it wasn't reasonable for him to think that Peralta was still a threat and keep the firearm, that he should have taken some other course of action. But doesn't the jury, as the conscience of the community, isn't that really their determination to say, well, Mr. Peralta believes that what he did was reasonable. We don't agree, as 12 members of the State of Nevada, as members of his community, that what he did wasn't reasonable. Now, this isn't – and one thing I really want to stress to this Court is this isn't the type of case that this Court talked about in Woodford, which is when a felon arms himself in advance of a crisis. When he has these vague threats around, he arms himself and he keeps a firearm for a protracted period of time. This is a case different in kind from that. What were the facts in terms of did your client have an opportunity to leave? That's a contested issue, a fact that would have been a great thing for the jury to have decided. But what was the – what were the guidelines of the period of the – that the Court had in terms of how long was it before from the altercation to when the probation people came? They weren't probation people. They were police officers. Police officers. Four minutes. A very protracted – not protracted, excuse me, the opposite. A very protracted period of time. Contract. We knew what you meant. That that was the proffer and that Mr. Peralta, even though he was trying to figure out what to do with the firearm, he didn't believe – he believed his brother still posed a threat. He was waiting for his father to come home or some other reasonable way to get rid of the firearm. And what the Court needs to focus on and what the case law says is when you have a situation, you have to look, first of all, at the time of possession, when he first took possession. There's no question under our proffer that at the time of possession, there was an eminent threat. Now, which is much different from cases like Phillips and Woodford where the defendant armed himself in advance of some supposed crisis. There was no threat at the time of the possession in those cases. The second thing the Court needs to look at is, well, did he dispose of the firearm within a reasonable time after the threat had abated? Our proffer is the threat was still there, that Richard Peralta was not secreted away into some fortress. He had not left the area. He was right there in the house. He could have come out of the house at any time, and that's what James believed. And that was his proffer. But unloading the firearm would have alleviated that problem. Well, Your Honor, first of all, it was a clip that's in the gun. Maybe he didn't know how to unload it. Maybe. We don't know. And there's an important point here is that there are evidentiary gaps here because he never was able to testify and tell his whole story. His dad wasn't able to testify and present his exculpatory material. There are evidentiary gaps in this record. We don't know if Peralta knew how to unload the firearm. Those are things that must be construed in favor of James. Well, couldn't have that been in the offer of proof, that he didn't know how to unload it? Well, Your Honor, you'd have to anticipate every single factual dilemma that would come up. And these are things that the jury, 12 angry men, would have been able to deliberate. Counsel, at that point in the middle of the trial, you should have been able to make a fairly detailed proffer as to what your evidence was going to be that you wanted to put on. Well, I would submit, if this Court looks at the proffer, which is on paper. We've read it. We've read it. I don't see anything in there about unloading or whether he knew how to unload a semiautomatic weapon. Well, his proffer was he didn't believe there was a safe place to put the weapon at the time. And even if he unloaded it and still possessed the ammo, he still would potentially be guilty, like in Newcomb, where the defendant disposed of the firearm, still had the ammo on him even after the threat had evaded him. The Court said that was okay because it was a matter of mere minutes. I'd like to reserve at least a couple of seconds for rebuttal. You have a couple of seconds. May it please the Court. Darren LaHood on behalf of the United States from the District of Nevada. At the outset, members of the Court, the government agrees that the justification necessity defense is applicable in extraordinary and rare cases. And as the Court is well aware, the Gomez case is really the benchmark case in which the justification necessity defense was used. And in that case, there were absolutely extraordinary conditions that were put in place there. And if you look at the Wofford and the Phillips case that followed both, that followed the Gomez case, they both rejected the justification necessity defense. And Gomez really, in looking at the facts of Gomez and what was put forth in that case, the level that the defendant has to reach is absolutely extraordinary. And when you look at the time frame in this particular case, and the facts are very, very important in this case, this defendant, Mr. Peralta, possessed this handgun that was fully loaded for over 25 minutes. Twenty-five minutes from the time the victim testified that he saw him wave this gun at him and his children, he put that gun in his waistband. If you look at the facts, police did not arrive there. They got a phone call at 7-09. They were dispatched. I'm sorry. The call went out at 7-09. They testified in the record that they got the call. They arrived there sometime between 7-10 and 7-15. But they met three streets away, the three officers. They met there, and they made a plan for how they were going to approach the residents there. They made that plan. They met. They essentially didn't arrive at the defendant's residence until 7-20, around there. So if you look at the facts, it's 25 minutes, and when they arrived there, the defendant's next to his motorcycle with that same gun in his waistband. This is a defendant that possessed this gun for 25 minutes. Did he ever try to secure this weapon? No. Did he ever try to get rid of this weapon? No. Did he ever try to unload this? No. Did he ever try to flee the neighborhood? Never. Did he ever try to call police? No. Did he ever try to go to a neighbor? Never did. Twenty-five minutes, he possesses a fully loaded handgun in his waistband. Those are the facts that are undisputed and unrefuted in the record. In looking at the four requirements that are laid out by the... What does the record show? Who called the police? The police were called by the victim, Damon Echols, at 7-09. The testimony is that Mr. Echols had his children come home at 6-45, between 6-45 and 6-50 on that evening. His children report to him, the man down the street just cussed at us. He immediately walks down the street. Given him the benefit of the doubt, let's say it's 6-50. He says he's only down there for two to three minutes. That's in the record. He goes down there. The defendant waves the weapon at him and his children, puts it in his waistband. He walks back. When he goes back, he's very angry, upset. He's thinking about revenge. That's in the record. He does not do that. When you say the defendant waves... I'm sorry. I'm sorry. The victim. Well, when you say initially, you're not talking about this defendant when you're saying wave the gun. Yes, I am. You're saying this one did. This defendant waved the gun, and if you look at the record, and I'd be happy to point it out, in the record, he not only waves the gun at the victim and his children, he also utters language to them saying, I'm not going to put up with this effing stuff today. So that incident is about two or three minutes long. He walks back with his children to his residence. He's distraught and angry, thinking about revenge. He calls his sister. What should I do? Should I go after him? No. 7-0-9, he makes the phone call to police, non-emergency number. They then relay the dispatch call to police. So this is, and he leaves the defendant with the gun. The victim's call has nothing to do with the defendant's brother. It has to do with the defendant himself. Absolutely. And that's clear from the victim's testimony. So we're looking at a time frame here of over 25 minutes that he does nothing but sits in front of his garage, works on this motorcycle with a fully loaded weapon. And this is a two-time convicted felon that does this. Well, part of the 25 minutes was taken up with the confrontation with Mr. Echols. Well, I disagree with that, Your Honor. If you look at the proffer and what Judge Hunt stated. You didn't listen to my question. I'm sorry. As I understand the scenario, the kids come home to tell Mr. Echols, their father, that this guy's cussing at them. Echols then leaves his house and goes down the street where he and Peralta have a confrontation, and Peralta at that point waves the gun at him and yells something about, I'm not putting up with this today. Then Peralta goes back to his house, or excuse me, Echols goes back to his house and calls 911, right? Correct. Okay. And then by the time the police get there, Peralta is calmly working on his motorcycle with the gun stuck in his waistband. Correct. Okay. And that whole period of time is about 25 minutes. Correct. Okay. But the proffer of when Peralta had the problem with his brother was relative to where? Your Honor, if you read the proffer, it's before the children come back to Mr. Echols is when the incident takes place, which is consistent with the gun being in his waistband or him having the gun when Mr. Echols arrives. So that proffer of him supposedly having this implausible story happens before 645 or 650, because he already has the gun and Judge Hunt went over that when he questioned the proffer. And so when you look at these four requirements laid out by the Lemon case and also that was looked at in Gomez, we believe that none of these four are satisfied. And the first one that is absolutely not satisfied is there was no reasonable legal alternative. Number three, as I stated, he had so many opportunities during those 25 minutes to get rid of this weapon, do something to this weapon, secure this weapon, go to police, did not do that. On the fourth element, in looking at the fact that there was no causal relationship, you've got to remember when they arrived, their police, which is in the record, the defendant was under no immediate threat or death of harm. He was sitting next to his motorcycle working on it. And if you look at the record when police arrived, he was reaching for the weapon. He was reaching for the weapon. He wasn't immediately spontaneously telling the police, oh, I just took this from my brother, I just did this. Never mentioned that, never made any statement to police when he's arrested. Simply is reaching for the gun. He has to be put in an arm hold in order to be arrested because he's reaching for this particular weapon. So I don't believe there's any causal relationship under number four from the threatened harm that happened 25 minutes before and him possessing that gun at that time. Looking at the first rationale that is under the Lemon Test, I would also argue that he was under no immediate threat or great bodily harm. When the proffer was put forth, there's no testimony in that proffer by defense counsel that the defendant's brother ever said, I'm going to kill you, I'm going to murder you, I'm going to do this, I'm going to do that. There was no evidence of that whatsoever. So looking at the first prong, number three and number four, they are not satisfied whatsoever from the facts that are put forth in this case. In looking at Gomez and looking at the extraordinary, extraordinary circumstances that are put in place. In looking at factor number two, it's a little bit ‑‑ the government could see that's probably our weakest point, but nonetheless, we believe that the defendant was not able to satisfy that factor, that he did not recklessly place himself in this situation. Obviously, Judge Hunt looked at this. That's a stretch. I think it probably is. To say they can't go see his brother. Yeah. He has a delusional brother, whatever, to say that he can't go visit him. I would agree, Your Honor, that that's probably a little bit of a stretch and the government could see that. But when we look really at the other three factors, there's no way the defendant can meet this threshold or burden. Mr. LaHood, how long did this case take to try? It took ‑‑ well, we did one full day, the government's case in chief, and then we got into this issue and then they did not present a defense. So it was a day and a half. A day and a half trial. And how much time would the defense have taken to put on their evidence if Judge Hunt had allowed them to put on the justification defense? If they were able to meet this four‑prong process, Your Honor, as I understand it, would put on the father and also present the defendant, is the way I understood it, would testify. With direct and cross‑examination, it would probably be another day, I'm guessing, a little over a day. For two witnesses? This whole thing happened in less than 25 minutes? Well, that may be a stretch, Your Honor. Less than a day. Okay. Let me ask you, as I understand what the district court said in rejecting it, the district said it would be misleading to the jury as to its responsibilities. Is that right? Well ‑‑ It said that. What did the district court mean by that? Well, Your Honor, there's obviously a body of law that's in place here. This justification necessity defense is not without limits. And there are limits here. So I understand. I'm just wondering what the district court meant when he said it would be misleading to the jury. Well, I guess that ‑‑ The defendant could have still testified, right? But he just couldn't get a justification instruction. And then if you said that, then you would have admitted the elements of the crime. Correct. I mean, the body of law is there for a reason. I mean, you know, that four‑prong test is there for a reason. And that's what the judge looked at. You know, we have this body of law. We have to abide by that. And I think that's what the judge meant by being able to say this implausible story that doesn't ‑‑ By telling the jury that it could believe something that didn't mean ‑‑ that it could accept something that didn't meet the requirements. Exactly, Your Honor. And I believe that's what Judge Hunt was getting to. Yeah. Okay. If there are no questions, I will conclude my argument. Thank you. Thank you. We'll give you 30 seconds. Or a minute. The government's presentation just makes me angry. Because it's not honest. Don't get angry. Just be dispassionate. It's not honest. You know, they did the same thing in their brief. They misconstrued the record. They make all inferences in their favor. There's no evidence in this record. It was 25 minutes. He just came up here and made that up. That's not in the record at all. It's contrary to the proverb. You can read the record. Right. You know, and they also are misstating the case law. When they did the same thing in their brief, they said, oh, this defense only pertains in extraordinary circumstances. Well, the quote that they took that little part out of says this, and then this is from Woodford. The defense of necessity of a rarely lying and felon in possession case, unless the ex-felon not being engaged in criminal activity does nothing more than grab a gun with which he or another is being threatened. Which is exactly what happened in this case. The case law doesn't say that it only pertains to extraordinary circumstances. It said it only pertains to extraordinary circumstances when the defendant arms himself in advance, as he did in Gomez. And that's exactly what that quote says. And they're misstating the law. And they're misstating the facts. Another thing that they said, that he just came up here and said, is that there's no evidence that James was being threatened. I mean, that's not what the record says at all. If you look at EOR 149 and 148, he said specifically that he was being threatened verbally and his brother was reaching for a gun. So that assertion is repelled by the record. I know I'm out of time. I strongly urge this Court to reverse and remand this matter so that James Peralta can have one full and fair trial. Thank you. Thank you, Counsel. Thank you, Counsel. The case just argued is submitted for decision. That concludes the Court's argument calendar for this morning. The Court stands adjourned. The Court is adjourned. The Court is adjourned.
judges: Schroeder, Tallman, Callahan